Filed 2/28/23  P. v. Williams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049231 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 87249) |
| v. | |
| HENRY LEE WILLIAMS, | |
| Defendant and Appellant. | |

In 1985, a jury found defendant Henry Lee Williams guilty of first degree felony murder, among other offenses.  The jury also found true a burglary-murder special circumstance allegation that Williams himself committed the killing with an intent to kill and allegations that he personally used a firearm during the commission of the charged offenses.  This court affirmed the judgment on direct appeal but concurrently granted Williams's petition for writ of habeas corpus and vacated the jury's finding on the special circumstance allegation.  At a retrial in 1990, a jury found the burglary-murder special circumstance allegation true.  Williams appealed, and this court affirmed the judgment.

Williams now appeals from a June 2021 order denying his petition to vacate his murder conviction and be resentenced under former Penal Code section 1170.95[1]

---

[1] Unspecified statutory references are to the Penal Code.

(hereafter petition).[2] Williams contends the trial court erred in denying his petition at the prima facie stage without issuing an order to show cause.

For the reasons explained below, we affirm the trial court's order denying the petition to vacate Williams's murder conviction.

## I. FACTS AND PROCEDURAL BACKGROUND[3]

On December 7, 1982, Williams and Orrin Payne entered the home of Kathleen and Michael Hynan. One of them shot and killed Kathleen.[4]

By information, the Santa Clara County District Attorney jointly charged Williams and codefendant Payne for this crime. The charged offenses comprised the murder of Kathleen (§ 187), burglary (§ 459), and robbery (§ 211). As to the murder charge, the information further alleged robbery- and burglary-murder special circumstances and that Williams and Payne intentionally aided and abetted another in the commission of first

---

[2] Effective January 1, 2022, the Legislature amended section 1170.95 in several respects. (See Stats. 2021, ch. 551, §§ 1, 2; see also *People v. Birdsall* (2022) 77 Cal.App.5th 859, 865.) A few months later, the Legislature renumbered section 1170.95 as section 1172.6, with no change to the text of the statute (Stats. 2022, ch. 58, § 10, eff. June 30, 2022). In this opinion we refer to the current version of any relevant provisions now codified in section 1172.6.

[3] The appellate record includes copies of various documents filed by the district attorney or Williams in the trial court. The documents were drawn from the trial court's file in the underlying prosecution of Williams but do not include the reporter's transcripts of Williams's trials. The appellate record also includes this court's opinions from Williams's first appeal and habeas corpus proceeding in case Nos. H000697 and H004206 (*People v. Williams* (Nov. 9, 1988, H000697 & H004206) [nonpub. opn.] (*Williams I*)) and his second appeal in case No. H007455 (*People v. Williams* (Oct. 28, 1992, H007455) [nonpub. opn.] (*Williams II*)).

In the trial court, the district attorney requested that the court take judicial notice of its own file (case No. 87249) and this court's opinions. Williams objected to the request only as to this court's opinions. No ruling on the district attorney's request for judicial notice appears in the appellate record. In this appeal, neither party has requested judicial notice of any court records, but both parties in their briefing cite to the various documents that appear in the appellate record, including this court's opinions. We likewise rely on the documents in the appellate record when stating the facts and procedural background of this matter.

[4] For clarity, we refer to Kathleen and Michael Hynan by first name.

2

degree murder.  For all three charges, the information alleged that Williams and Payne each personally used a firearm (§ 12022.5).[5]

Williams and Payne were tried separately.

In 1983, Payne agreed to a bench trial based on the transcript of the preliminary examination, and the district attorney agreed not to seek a death sentence for him.  The trial court found Payne guilty of first degree murder with a burglary-murder special circumstance and fixed Payne's penalty at life without the possibility of parole.  (See *Williams I*, *supra*, H000697 & H004206, at p. 26, fn. 10.)

In February 1985, the district attorney filed an amended information charging Williams with the murder of Kathleen (§ 187; count 1), burglary (§ 459; count 2), and robbery (§ 211; count 3).  For count 1, the amended information further alleged a burglary-murder special circumstance (former § 190.2, subd. (a)(17)(vii)).  For counts 1 through 3, the amended information alleged that Williams personally used a firearm (§ 12022.5) (firearm allegation).[6]

A.  *1985 Trial*

Williams stood trial in 1985.  We briefly summarize some of the evidence presented at that trial based on the facts stated in this court's opinion in *Williams I*, *supra*, H000697 & H004206, at pages 2 through 7.

Kathleen's husband Michael testified at trial that when he arrived home from work on December 7, 1982, he saw two unfamiliar bicycles outside his and Kathleen's house.  Suspecting that their garage was being burglarized, Michael told Kathleen to call the police and went to a bedroom to retrieve a pellet gun.  There, a burglar surprised Michael,

---

[5] The information also charged Williams with one unrelated burglary and Payne with seven other offenses.

[6] The amended information further charged Williams with three other counts of burglary (§ 459) and two counts of receiving stolen property (§ 496), occurring at times and places different than the December 7, 1982 crime.  The amended information also alleged that Williams had suffered a prior robbery conviction.

pinned Michael's arm behind his back, led him to the living room, and pushed him to the floor. As Michael fell, he saw a second burglar enter the house. Michael heard the second man confront Kathleen and order her to put the phone down. Kathleen pleaded not to be shot. Michael heard two gunshots and Kathleen's screams. As the burglars made their way out of the house, they stopped to rob Michael of his wallet and checkbook. Michael "identified Payne as the person who confronted him in the bedroom. He identified Williams as the one who entered the kitchen and, by process of elimination, must have shot [Kathleen]. [Michael] conceded, however, that these identifications did not agree in all respects with his memory of the burglars." (*Williams I*, *supra*, H000697 & H004206, at pp. 4–5.)

Payne testified for the prosecution. Payne said he confronted Michael in the bedroom, grabbing him from behind as he was reaching for a pellet gun. Michael dropped the gun on Payne's order, and Payne led Michael to the living room and pushed him to the floor. "While [Michael] lay on the floor, Payne returned to the bedroom to retrieve the gun. From the bedroom, Payne heard Williams order [Kathleen] to hang up the phone, heard [Kathleen] plead with Williams not to shoot, and, finally, heard two shots." (*Williams I*, *supra*, H000697 & H004206, at p. 6.)

At the trial, the defense "conceded that Williams participated in the burglary and was guilty of first degree murder under the felony murder rule." (*Williams I*, *supra*, H000697 & H004206, at p. 3.) However, Williams's defense counsel argued to the jury that Williams was " 'not guilty of shooting [Kathleen] and he's specifically not guilty of shooting her with the intent to kill her.' " (*Williams I*, *supra*, H000697 & H004206, at p. 4.)

The prosecution "attempted to prove intent by showing that Williams was the actual killer. Thus, the major issue at trial was: who shot [Kathleen], Williams or Payne?" (*Williams I*, *supra*, H000697 & H004206, at p. 4.)

4

The trial court instructed the jury on, inter alia, willful, premeditated, and deliberate murder (using CALJIC No. 8.20), felony (burglary) murder (using CALJIC Nos. 8.21 & 8.79), and aiding and abetting principles, including the natural and probable consequences doctrine (using CALJIC Nos. 3.00 & 3.01).[7]

Regarding the special circumstance allegation, the jury instructions stated: "To find that the allegation of special circumstance . . . is true, it must be proved: [¶] 1. That the murder was committed while the defendant was engaged in the commission or attempted commission of a burglary. [¶] 2. That the defendant specifically intended to kill a human being. [¶] 3. That the defendant was himself the killer, and [¶] 4. That the murder was committed in order to carry out or advance the commission of the crime of burglary or to facilitate the escape therefrom or to avoid detection."

The instructions also stated: "[T]he crime of first degree murder based on a theory of felony murder requires only the specific intent to commit a certain kind of felony, in this case burglary. The allegation of a special circumstance of burglary requires a specific intent to commit burglary, and a specific intent to kill."[8]

Regarding the firearm allegation, the trial court instructed, in relevant part, as follows: "It is alleged in Counts 1, 2, [and] 3 that the defendant personally used a firearm

[7] The instructions did not include former CALJIC No. 8.27, a pattern instruction that addressed "the law regarding nonkiller complicity in the felony-murder context." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1159.)

[8] At the time of Williams's trial, the felony-murder special circumstance required proof of an intent to kill regardless of whether the defendant was the actual killer. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153–154 ["we construe the word 'intentionally' in subdivision (b) of section 190.2 to apply to all defendants—actual killers and accomplices alike—and to require an intent to kill before a defendant is subject to a special circumstance finding under paragraph 17 of that section"], overruled by *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 (*Anderson*); see also *Carlos*, at pp. 135–136 ["In resolving the uncertainties of the statutory language, we have concluded that the 1978 initiative should be construed to require an intent to kill or to aid in a killing as an element of the felony murder special circumstance. . . . The various principles of construction thus unite to impel an interpretation which finds an intent to kill requirement in the felony murder provision of the 1978 initiative."].)

during the commission of the crimes charged. [¶] The word 'firearm' includes a hand gun [*sic*]. The 'firearm' need not be operable. [¶] The term 'used a firearm,' as used in this instruction, means to display a firearm in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it." (Brackets omitted.)

The jury found Williams guilty of first degree felony (burglary) murder (count 1), first degree burglary (count 2), and robbery (count 3). The jury, however, did not return a verdict on a question whether the first degree murder was "deliberated and premeditated."[9]

The jury found true the burglary-murder special circumstance allegation attached to count 1 and the firearm allegations attached to counts 1 through 3.

In the penalty phase, the jury returned a verdict setting the penalty for the special-circumstance murder conviction at life in prison without the possibility of parole. The trial court sentenced Williams to 10 years and eight months in prison consecutive to life without the possibility of parole.

B. *First Direct Appeal and Habeas Corpus Petition*

Williams appealed the judgment (case No. H000697). He also filed a petition for writ of habeas corpus in this court alleging that the prosecution had failed to disclose exculpatory evidence concerning a statement made to law enforcement by a jail inmate (Robert Nelson) who had claimed to have heard Williams's coperpetrator Payne admit that he had shot Kathleen (case No. H004206). In an opinion that addressed both Williams's direct appeal and his habeas corpus petition, a panel of this court affirmed the judgment but granted Williams's habeas corpus petition, vacated the jury's special circumstance finding, and remanded the matter for a possible retrial of the special circumstance allegation. (*Williams I*, *supra*, H000697 & H004206, at p. 39.)

---

[9] In addition, the jury found Williams guilty of one of the unrelated burglary counts and two unrelated counts of possession of stolen property. The jury acquitted Williams of two unrelated burglaries.

6

C. *1990 Retrial of Burglary-Murder Special Circumstance Allegation*

At a retrial held in 1989, the jury could not reach a unanimous decision on the special circumstance allegation, and the trial court declared a mistrial.

In 1990, another retrial of the special circumstance allegation occurred. We summarize the evidence presented at the 1990 retrial based on the facts stated in this court's opinion in *Williams II*, *supra*, H007455, at pages 3 through 9.[10]

1. Evidence Presented at Retrial

On December 7, 1982, Williams and Payne went to the home of Michael and Kathleen Hynan, intending to burglarize it. Kathleen was inside with a small child, and Williams and Payne saw that the house was occupied. Shortly after Williams or Payne had entered the residence, Michael arrived home from work. Seeing two unfamiliar bicycles outside his home, Michael told Kathleen to call the police. He went to the master bedroom closet and retrieved a pellet gun. When Michael turned around, one of the burglars suddenly attacked him. The attacker said, "Shut up or I'll blow your fucking head off." Michael dropped his pellet gun, and the attacker led him to the living room, pushed him down, and said, "Get on the floor face down." As Michael was falling, he saw a second burglar enter the family room. Michael heard that burglar say, "[p]ut the fucking phone down," heard Kathleen reply "[p]lease don't shoot me," and then heard a shot, a scream, and another shot. The shooter returned to the living room, carrying a small caliber chrome handgun, and put his foot on the back of Michael's head. Michael then heard a voice say, "Where is the money, all of it?" In response, Michael handed over his wallet and checkbook from his pants pocket. As one of the burglars started to leave, the other pulled Michael's glasses off his face and threw them against the wall. Both men then left.

---

[10] We do not use quotation marks in part I.C.1 to indicate material that is copied directly from this court's opinion in *Williams II*, *supra*, H007455. Language that appears in quotation marks in part I.C.1 appeared as such in *Williams II*.

Michael provided descriptions of the burglars to police. To one officer at the scene, Michael described both burglars as Black males in their 20s who each wore a hooded sweatshirt. He said the burglar who attacked him in the bedroom was 5 feet, 8 or 9 inches, husky, with broad shoulders. When speaking to another officer at the scene, Michael added that the person who attacked him weighed 180 or 190 pounds, had no facial hair, "chocolate-brown-colored" skin, and wore a faded medium-blue wind breaker with a hood, and dark pants. The attacker had a full face, full cheeks, a "full mouth of even teeth," medium lips, and a medium nose. Michael also said the shooter was 5 feet, 7 or 8 inches, 150 to 160 pounds, slimmer in build than the other man, with a narrower face and lighter colored skin. Later that day, Michael reiterated to a third officer that the person who attacked him was huskier and bigger than the shooter.

According to a police officer who interviewed Williams in mid-December 1982, Williams was 5 feet 5 inches tall and weighed 145 pounds. The officer also interviewed Payne, who was 5 feet, 10 or 11 inches tall and weighed 170 pounds. When the officer asked Payne if he ever told anyone he shot the woman, Payne said, "I don't think so" and denied ever bragging about killing her.

Robert Nelson testified for the defense. He had known Williams for 17 years and Payne for almost the same length of time. In 1983, while Nelson was in the Santa Clara County jail for a violation of his probation for a burglary conviction, Nelson saw Payne motion to another inmate in a "trigger" fashion and heard him say he had "shot the bitch." Later, in 1985, Nelson and Payne were both inmates at Folsom State Prison. There, Nelson heard Payne tell several other inmates how the Hynan shooting had happened, and Payne claimed his partner was a coward and did not want to do anything but that he (Payne) shot the woman. In 1989, Nelson and Payne encountered each other at Folsom Prison. After Payne confronted Nelson about some papers that Payne possessed, Nelson walked away from Payne and then everything "went black." Nelson had been stabbed. In addition, Nelson testified that he had spoken with someone from

8

the sheriff's department in 1984 or 1985 about what he had heard. Nelson denied that his memory was foggy about what occurred in 1983 and 1985 and denied being on any medication. Nelson also said he was in court "testifying for [his] friend."

According to Terry Hoffman, Payne once admitted personally killing Kathleen. Shortly after the shooting, Hoffman was standing close to Payne in a group of people and overheard him say, "Yes, I killed the white bitch." Payne seemed to be bragging and "everybody just looked at him like . . . he was crazy." Hoffman was impeached for bias; she knew Williams from school where he had dated Hoffman's sister, whom he subsequently married.

Michael Johnson testified that Payne had admitted killing Kathleen. Johnson had known Williams for a long time and had lived with Williams's family at one point. According to Johnson, sometime in 1982, Payne told him, "Yeah, Mike, . . . I shot this lady." During cross-examination, the prosecutor quoted from a transcript of a 1985 tape recording in which Johnson apparently told police officers and his parole agent that Payne had told him "we" shot the lady.

Payne invoked his Fifth Amendment rights at Williams's retrial, and his testimony from the 1985 trial was read to the jury. At the 1985 trial, Payne testified that he and Williams decided to burglarize the Hynan residence even though they could see through a window that there was a young child and a woman inside the house. Payne said he confronted Michael in the bedroom and Williams shot Kathleen. Payne explained that he grabbed Michael from behind as Michael was reaching for a pellet gun in the closet. Payne ordered Michael to drop the gun, and Michael complied. Payne then led Michael to the living room and pushed him to the floor. While Michael lay on the floor, Payne returned to the bedroom to retrieve the gun. From the bedroom Payne heard Williams order Kathleen to hang up the phone, heard Kathleen plead with Williams not to shoot, and finally, heard two shots.

9

Williams's defense counsel demonstrated that Payne did not have good knowledge of the bedroom in which he claimed to have hidden and confronted Michael. While Payne said he was hiding behind a crib when Michael entered, Michael testified there was no crib. Payne said he considered escaping through the bedroom window when he heard Michael return home but "could see it was a crank-open window," and "[b]y the time [he] crank[ed] open the window, the man would have been in the room." Michael testified, however, that the bedroom window was a sliding window with a channel lock.

Psychologist Elizabeth Loftus, an expert in eyewitness identification, perception, and memory, testified for the defense that, under extremely stressful or frightening situations, there can be significant impairment in the ability to remember certain details and that, over time, memory is vulnerable to "post-event information." Loftus also maintained that there is little relationship between how certain someone is and how likely he is to be accurate about a memory.

In 1983, Jim Teague Barron was incarcerated in the Santa Clara County jail for property theft. While he, Payne, and other inmates were watching the news, there was a broadcast about a woman who had been killed in the course of a burglary. Payne seemed very nervous. Someone took him out of the cell; when Payne returned, he was still nervous. He stated they wanted to get him for the murder and denied doing it. Payne claimed someone else did the shooting and that he was in another room when it occurred. Teague specifically recalled Payne saying, "seriously, seriously man, I didn't pull the trigger. I didn't shoot that woman."

2. Jury Instructions, Verdict, and Sentence

At the 1990 retrial, the trial court instructed the jury with several instructions concerning the burglary-murder special circumstance allegation, including CALJIC Nos. 8.80 modified, 8.83, 8.81.17 modified, 3.31 modified, and 8.83.1.[11]

---

[11] The instructions quoted in part I.C.2 appear in the appellate record.

10

The modified version of CALJIC No. 8.80 (denoted as instruction No. 20) read as follows: "The defendant in this case has already been found guilty of the [f]irst [d]egree [m]urder of Kathleen Ann Hynan. You must determine if the following special circumstance is true or not true: [¶] 'That the murder of Kathleen Ann Hynan was an intentional killing, and was committed while the defendant, Henry Lee Williams was engaged in, and was an accomplice in, the commission, the attempted commission, and the immediate flight after the commission and attempted commission of a felony, to wit: Burglary.' [¶] The People have the burden of proving the truth of a special circumstance. . . . [¶] If you find beyond a reasonable doubt that the defendant was either the actual killer or an aider or abetter, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a human being in order to find the special circumstance to be true. On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true. [¶] In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously. [¶] You will state your special finding as to whether the special circumstance is or is not true on the form that will be supplied."[12]

---

[12] By the time of Williams's retrial, our Supreme Court had overruled *Carlos*, concluding in *Anderson* that "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." (*Anderson*, *supra*, 43 Cal.3d at p. 1147; see also *id*. at p. 1145 ["the aider and abetter must intentionally aid *in a killing*"].)

As relevant to this case, former section 190.2, subdivision (a)(17) defined the felony-murder special circumstance as, " 'The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit . . . the following felonies [including burglary].' " (*Anderson*, *supra*, 43 Cal.3d at p. 1141.) Former "[s]ection 190.2[, subdivision] (b) provide[d] in relevant part that 'Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling,

11

The trial court also instructed with the following modified version of CALJIC No. 8.81.17 (instruction No. 22): "To find that the special circumstances, referred to in these instructions as murder in the commission of [b]urglary is true, (as opposed to defendant being the actual shooter), it must be proved: [¶] 1) The murder was committed while the defendant was engaged in the commission of a [b]urglary and [¶] 2) The murder was committed in order to carry out or advance the commission of the crime of [b]urglary or to facilitate the escape therefrom to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [b]urglary was merely incidental to the commission of the murder. [¶] You are instructed that the defendant is guilty of [b]urglary of the Hynan residence."

The trial court further instructed regarding the special circumstance allegation as follows (instruction No. 25): "The fact that Kathleen Hynan was shot and killed during the commission of a burglary, alone, does not establish the truth of a special circumstance unless you believe beyond a reasonable doubt that: [¶] (1) Henry Williams was the individual who actually shot Kathleen Hynan; or [¶] (2) Henry Williams was an aider and abettor and had the intent to kill or aid in the killing of Kathleen Hynan."

Additionally, the trial court instructed the jury with several instructions concerning aiding and abetting principles. The instructions included CALJIC No. 3.01, which read as follows (instruction No. 27): "A person aids and abets the commission of a crime when he . . . [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be

commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree' shall suffer death or life imprisonment without possibility of parole in any case in which any special circumstance other than a prior murder conviction is charged and found true." (*Ibid.*; see § 190.2, subd. (c).)

12

personally present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (Brackets omitted.)

Using a modified version of CALJIC No. 3.02, the trial court instructed on natural and probable consequences in the context of aiding and abetting (instruction No. 28): "One who aids and abets is not only guilty of the particular crime that to [his] knowledge [his] confederates are contemplating committing, but [he] is also liable for the natural and probable consequences of any criminal act that [he] knowingly and intentionally aided and abetted. The defendant is guilty of burglary of the Hynan residence. You must now determine whether the murder of Kathleen Hynan was a natural and probable consequence of such originally contemplated crime."

During deliberations, the jury asked the trial court to "explain instruction[] [No.] 22" (i.e., modified CALJIC No. 8.81.17) and "clarify especially in regards to [the] difference between murder in a commission of burglary as opposed to the shooter." (*Williams II*, *supra*, H007455, at p. 21.)

The trial court responded by rereading "instruction [No.] 25" and adding: " 'If you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true. [¶] If you find beyond a reasonable doubt the defendant was an aider or abettor and not the shooter, then you must also find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a human being in order to find the special circumstance true. [¶] If you find beyond a reasonable doubt that defendant was either the actual killer or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a

13

human being in order to find the special circumstance to be true." (*Williams II*, *supra*, H007455, at pp. 21–22.)

Over the next two days of deliberations, the jury asked two questions concerning instruction No. 20 and first degree murder.[13] The trial court did not provide any additional substantive instruction in response to the jury's first question. Instead, the court asked the jury to further specify the help it needed. (*Williams II*, *supra*, H007455, at p. 22.) As for the second question, the court told the jury that " '[f]irst degree murder is not an issue which you must decide in this case. . . . I, therefore, find it inappropriate to give you the definition of first degree murder or to provide you with the original allegations relating to first degree murder. Your sole job is to decide whether the special circumstance is true or not true in accordance with the instructions I've given you.' " (*Williams II*, *supra*, H007455, at pp. 22–23.)

On May 24, 1990, the jury found the burglary-murder special circumstance allegation true. The verdict form did not specify the theory on which the finding was based (i.e., actual killer liability, aider and abettor liability, or "unable to decide which" liability). The verdict read as follows: "We, the Jury in the above-entitled cause, find that the allegation that the murder of Kathleen Ann Hynan was an intentional killing, and was committed while the defendant [Williams] was engaged in the commission or the attempted commission, or the immediate flight after the commission or attempted commission of a felony, to wit: [b]urglary, is true."

---

[13] The first question read: " 'Relative to instruction #20 we tend to agree with the allegations -- however the further clarification – "aide [*sic*] in the killing" has confused the issue – at what point does a person provide aide [*sic*] and in what manner? What is the definition of "intended" and at what point does it begin?' " (*Williams II*, *supra*, H007455, at p. 22.) The second question read: " '(1) Please give us the definition of "first degree murder." [¶] (2) Please define first degree murder as it pertains to this case. [¶] (3) What were the allegations of the first degree murder charge of which he was found guilty?' " (*Id*. at p. 21.)

14

Williams filed a motion for new trial and motion to strike the special circumstance finding pursuant to section 1385. "Attached to each motion were three juror affidavits, each of which proclaimed that the jurors (1) unanimously found the special circumstance true, (2) were unable to decide unanimously whether or not defendant was the shooter, and (3) 'agreed that the murder of Kathleen Hynan was an intentional killing and that Henry Williams was an aid [*sic*] and abettor and had the intent to kill or aid in the killing of Kathleen Hynan.' " (*Williams II*, *supra*, H007455, at pp. 27–28.) The trial court denied the motions and refused to consider the juror affidavits but allowed the affidavits to remain in the record. (See *id*. at pp. 27–29.)

The trial court resentenced Williams to life without the possibility of parole for his murder conviction consecutive to the same terms of imprisonment that it had previously imposed for the other counts after Williams's 1985 trial.

D. *Second Direct Appeal*

Williams appealed, and a panel of this court affirmed the judgment (H007455). (*Williams II*, *supra*, H007455, at p. 32.)

In one of his claims on appeal, Williams contended that the trial court erred by refusing to require the jurors to unanimously agree upon the theory on which they found the special circumstance true. (*Williams II*, *supra*, H007455, at pp. 1, 16–17.) He argued that "it is possible the jurors were split on what he did," with some believing "that he shot and killed [Kathleen], while others may have concluded that he was the burglar who accosted [Michael] in the bedroom and was therefore an aider and abetter as to the murder." (*Id*. at p. 16.) This court rejected the claim, concluding "that jury unanimity was not required as to the facts or theory supporting a felony-murder special circumstance finding." (*Id*. at pp. 16–17.)

In another claim, Williams contended that "the jury instructions 'improperly mixed the standard of criminal liability for an aider and abetter in the felony-murder context with the intent and mental state requirements for special circumstance findings.'

15

He claim[ed] the effect of the improper instructions 'was to remove an element of the special circumstance from the jury's consideration and to confuse the applicable standards.' " (*Williams II*, *supra*, H007455, at p. 17.)

This court rejected Williams's claim. The court explained that Williams's "assertion that the instructions permitted the jury to infer special circumstance liability if it believed he intended only to aid in the burglary ignores the specific instruction which told the jury that the fact the killing took place during the commission of a burglary alone does not establish the truth of the special circumstance unless the jurors believed beyond a reasonable doubt that defendant was the actual shooter or the aider and abetter and had the intent to kill or aid in the killing." (*Williams II*, *supra*, H007455, at p. 20.) The court also rejected Williams's argument that the jury notes "demonstrate that the jury was confused." (*Id*. at p. 21.) The court concluded: "In light of the specific instructions which told the jury it could not find the special circumstance true unless it believed defendant was the actual shooter or that he intentionally aided and abetted in the killing, and in light of the jury's obvious willingness to seek clarification of the instructions when so needed, we see no evidence that the jury was confused or misled in reaching its decision." (*Id*. at p. 23.)

Additionally, the court rejected Williams's claim that "there was insufficient evidence that the non-shooter intentionally aided and abetted the shooter in the murder." (*Williams II*, *supra*, H007455, at p. 24.) The court stated: "We conclude that the facts and circumstances of this case, viewed in a light most favorable to the finding, permitted a rational trier of fact to conclude that even if defendant was not the actual shooter, he intentionally aided and abetted in the killing." (*Id*. at p. 27.)

E. *2019 Resentencing Petition and Trial Court's 2021 Ruling*

In March 2019, Williams filed on his own behalf a petition for resentencing pursuant to former section 1170.95. In the petition, Williams checked boxes alleging that he had been convicted under a theory of felony murder and could not now be convicted

16

of murder because of the changes made to sections 188 and 189 effective January 1, 2019. He further alleged that he was not the actual killer, he did not aid or abet the actual killer in the commission of first degree murder with an intent to kill, he either was not a major participant in the felony or did not act with reckless indifference to human life during the course of the felony, and the victim was not a peace officer performing his or her duties.

The trial court appointed counsel for Williams and received extensive briefing from the district attorney and Williams's counsel.

In his briefing through counsel, Williams argued: "The instructions allowed the jury to find the special circumstance true if Mr. Williams was not the actual killer but had the intent to kill *or* was an aider and abettor in the murder. Penal Code section 189, subdivision (e)(2), however, required he had the intent to kill *and* was an aider and abettor in the murder. For this Court to determine he had the intent to kill and aided and abetted in murder, this Court must make a new factual finding. It cannot do this in determining whether to issue an order to show cause."

The district attorney opposed the petition arguing, inter alia: "Petitioner is ineligible as a matter of law because a jury necessarily found beyond a reasonable doubt that the defendant was either the actual killer or an aider and abettor who acted with the intent to kill or aid in the killing of Kathleen Hynan. By this finding, there is certainly substantial evidence to demonstrate that the defendant was either the actual killer or an aider and abettor in the murder with the intent to kill. And by this finding, a jury did in fact find beyond a reasonable doubt the requisite elements for a murder conviction today, and the court does not need to go any farther."

On June 3, 2021, the trial court held a hearing on the petition. The court heard argument by the parties and ruled as follows: "I've read the appellate record on the matter, having read the initial jury verdict of guilt, and the finding of either one of the special circumstances in further order of the appeal on the re[trial]. [¶] Again, I have

17

read and reviewed the Court record, the jury instructions, the findings, as well as the opinions of the appellate [c]ourt. And based on the Court's review, it does appear to me that there is, regardless of whether applying the standard, without that the Petitioner setting [*sic*] the prima facie case that they are eligible for relief under [section] 1170.95 , the Court is denying the Petition at this time."

Williams timely appealed the trial court's order.

## II. DISCUSSION

Williams contends the trial court erred in denying his petition without issuing an order to show cause because he "made the required prima facie showing, while no indisputable fact – such as a jury instruction, finding, or verdict – conclusively proved that his averments were untrue." Williams asserts that he "was convicted of felony murder and there was no finding by the jury that [he] was the actual killer." He further asserts that if the trial court had accepted his factual assertions, "it would have become clear that [he] did not act with malice and that he was in fact eligible for relief." Additionally, Williams contends that the trial court's failure to issue an order to show cause was not harmless because he "simply agreed to participate in a burglary [and] was unaware that his co-defendant would kill anyone," and "[t]he facts of the case fail to establish that [Williams] acted with reckless indifference to human life or that he was a major participant."

The Attorney General counters that the record of conviction establishes Williams is ineligible for section 1172.6 relief as a matter of law because the jury instructions at the 1990 retrial "conclusively demonstrate that in finding the felony murder special circumstance true, the jury determined either that [Williams] was the actual killer or that he had the intent to kill." The Attorney General further contends that "the [jury's] finding conclusively refutes [Williams]'s allegation that he could not now be convicted of first or second degree murder under amended sections 188 and 189." Additionally, the Attorney General acknowledges that the jury at retrial was instructed on aiding and

18

abetting principles with an instruction that included a reference to the natural and probable consequences doctrine (instruction No. 28).  The Attorney General, however, asserts that that instruction was inapplicable to the jury's determination of the truth of the special circumstance allegation and thus would have been ignored by the jury.[14]

### 1. Legal Principles

"Senate Bill [No.] 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Stats. 2018, ch. 1015, § 1, subd. (f) [(Senate Bill 1437)].)"  (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

As amended by Senate Bill 1437, section 188 provides in relevant part:  "(a) For purposes of [s]ection 187, malice may be express or implied.  [¶] . . .  [¶]  (3) Except as stated in subdivision (e) of [s]ection 189 [regarding the felony-murder rule], in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)  Furthermore, as our Supreme Court has explained, " 'Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought.' "  (*Gentile*, *supra*, 10 Cal.5th at p. 848; see also *People v. Vang* (2022) 82 Cal.App.5th 64, 81 (*Vang*); *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 (*Ervin*) ["Liability for intentional, target offenses is known as 'direct' aider and abettor liability."].)

---

[14] The Attorney General makes no specific argument that the initial trial jury's guilty verdict on first degree felony (burglary) murder, true finding on the subsequently vacated burglary-murder special circumstance, or true finding on the firearm allegation establish that Williams is ineligible for relief under section 1172.6.  We thus do not address whether the felony murder verdict and attached findings at Williams's 1985 trial (alone or in combination) might suffice to deny his petition at the prima facie showing stage.

In turn, regarding the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e). (Stats. 2018, ch. 1015, § 3.) "[S]ection 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citation] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' [citation]. Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2' — that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*), quoting § 189, subd. (e).)[15]

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*Strong*, *supra*, 13 Cal.5th at p. 708.) When the trial court receives a petition under section 1172.6 requesting vacatur of a murder, attempted murder, or manslaughter conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause [(OSC)].' " (*Ibid*., citing *People v. Lewis* (2021) 11 Cal.5th 952, 970–972 (*Lewis*), § 1172.6, subd. (c).)

---

[15] Section 189, subdivision (e), provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).)

During the prima facie stage of review, the trial court "may look at the record of conviction . . . to determine whether a petitioner has made a prima facie" showing. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) However, the prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Ibid*.) The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Ibid*.) " '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid*.) Although the court may rely on the record of conviction (including appellate opinions) in determining whether defendant has made a prima facie showing, " 'an appellate opinion might not supply all answers,' " and the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at p. 972; see also § 1172.6, subd. (d)(3) ["The court may [] consider the procedural history of the case recited in any prior appellate opinion" at the post-OSC evidentiary hearing].)

"The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have the murder . . . conviction vacated and to be resentenced." (§ 1172.6, subd. (d)(2).) "Otherwise, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437." (*Strong*, *supra*, 13 Cal.5th at p. 709, citing § 1172.6, subd. (d)(3).)

"We independently review a trial court's determination on whether a petitioner has made a prima facie showing." (*People v. Harden* (2022) 81 Cal.App.5th 45, 52 (*Harden*).)

2. <u>Analysis</u>

In *Strong*, our Supreme Court rejected both the "Attorney General's argument that prior special circumstance findings always foreclose relief in section 1172.6 proceedings" (*Strong*, *supra*, 13 Cal.5th at p. 716), and an argument by an amicus curiae "that the Legislature did not intend for any type of prior Penal Code section 190.2 finding to be treated as conclusive in resentencing proceedings." (*Id*. at p. 714.) Our high court, nevertheless, confirmed in *Strong* that a petition may be dismissed at the prima facie stage "[i]f the petition and record . . . establish conclusively that the defendant is ineligible for relief." (*Id*. at p. 708.) The court also confirmed that "Senate Bill 1437 relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*Id*. at p. 710; §§ 189, subd. (e), 1172.6, subd. (a); see also *People v. Garcia* (2022) 82 Cal.App.5th 956, 969; *Harden*, *supra*, 81 Cal.App.5th at p. 52; *People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

The *Strong* court explained that "[i]n general, whether a prior finding will be given conclusive effect in a later proceeding is governed by the doctrine of issue preclusion, also known as collateral estoppel." (*Strong*, *supra*, 13 Cal.5th at p. 715.) "As traditionally understood and applied, issue preclusion bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*Id*. at p. 716.)

Turning to the crux of the dispute in this case, we must decide whether, based on the record of conviction before us, Williams is ineligible for relief under section 1172.6

22

because of the jury's true finding on the burglary-murder special circumstance allegation at his 1990 retrial (after this court affirmed his underlying convictions for first degree felony (burglary) murder, first degree burglary, and robbery). Put differently, the issue here centers on whether the jury instructions and the ensuing special circumstance finding on retrial necessarily determined that, contrary to Williams's averments in his petition, he "was the actual killer" (§ 189, subd. (e)(1)) or "was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (*Id*., subd. (e)(2).)[16]

As detailed *ante* (part I.C.2), instruction No. 20 told the jurors that to find the special circumstance true they had to unanimously determine (1) " 'the murder of Kathleen Ann Hynan was an intentional killing' " and (2) the murder " 'was committed while . . . Williams was engaged in, and was an accomplice in, the commission, the attempted commission, and the immediate flight after the commission and attempted commission of a . . . [b]urglary.' " This instructional language mirrored the special circumstance allegation as written on the verdict form, which the jurors ultimately endorsed as true.

Instruction No. 20 provided additional requirements for finding the special circumstance allegation true. The instruction told the jurors that if they found beyond a reasonable doubt that Williams was "the actual killer," they did not need to find that he "intended to kill a human being." However, if they found beyond a reasonable doubt that Williams "was either the actual killer or an aider or abetter," but were "unable to decide

---

[16] The major participation and reckless indifference requirements described in section 190.2, subdivision (d), were not at issue in Williams's retrial because that theory of felony-murder special-circumstance liability was added by voter initiative after the retrial. (See *Strong*, *supra*, 13 Cal.5th at pp. 704–705; *People v. Banks* (2015) 61 Cal.4th 788, 797–798.) Therefore, we need not consider that theory of murder liability under section 189, subdivision (e)(3), in this appeal. (See *Ervin*, *supra*, 72 Cal.App.5th at p. 107, fn. 5.)

which," then they had to find that Williams "*intended either to kill a human being or to aid another in the killing of a human being*." (Italics added.)

Hence, under this instruction, if a juror believed Williams was the actual killer, the juror could find the special circumstance allegation true without any additional determination regarding whether Williams harbored an intent to kill. But if a juror were unable to decide whether Williams was the actual killer or aider and abettor (of an otherwise unspecified crime or act), the juror had to find that Williams either (1) intended to kill or (2) intended to aid another person in the killing.

In addition, the trial court instructed the jurors (with instruction No. 25) that if "Kathleen Hynan was shot and killed during the commission of a burglary," that fact alone was not enough to "establish the truth of a special circumstance unless" they further believed that Williams (1) "*was the individual who actually shot Kathleen*" or (2) "*Williams was an aider and abettor and had the intent to kill or aid in the killing of Kathleen*." (Italics added.)

Instruction No. 25 thus echoed instruction No. 20 but clarified that if a juror did not believe that Williams was the actual shooter, the juror had to find that Williams was "an aider and abettor" and further that Williams had the intent to kill or the intent to aid in the killing. As such, this instruction addressed a scenario not explicitly covered by instruction No. 20. That is, the instruction described the requisite findings for a circumstance in which the juror had decided, beyond a reasonable doubt, that Williams was an aider and abettor—as compared to if the juror was "unable to decide" whether Williams was "the actual killer or an aider and abetter," as addressed in instruction No. 20. (Cf. *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 180–181.)

As discussed *ante* (part I.C.2), in response to a jury question during deliberations, the trial court provided further instruction on the requirements for finding the special circumstance allegation true. That instruction reiterated the three scenarios previously described to the jury. That is, (1) if a juror found that Williams was the actual killer, no

24

additional finding of his intent to kill was necessary, (2) if a juror found that Williams "was an aider or abettor and not the shooter," the juror had to further find that Williams "intended either to kill a human being or to aid another in the killing of a human being," and (3) if a juror found that Williams was the actual killer or an aider and abettor but could not decide which, the juror had to further find that Williams "intended either to kill a human being or to aid another in the killing of a human being." (*Williams II*, *supra*, H007455, at pp. 21–22.) Accordingly, this additional instruction further elucidated the three alternative scenarios presented for the jury's consideration, i.e., (1) Williams was the actual killer/shooter, (2) Williams was not the shooter but was an aider and abettor, and (3) Williams was either the shooter or an aider and abettor, but the juror was unable to decide which.

Having described the special circumstance instructions provided to the jury at Williams's retrial, we turn to analyzing the congruence between the instructions and verdicts at Williams's trials and the elements of amended section 189, subdivision (e). Given that Williams was found guilty of first degree burglary at his 1985 trial, and the jury at his retrial found that the intentional murder of Kathleen was committed while Williams was committing or attempting to commit the burglary, it is indisputable that the prosecution proved the first requirement under amended section 189, subdivision (e). That is, Williams was "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [(i.e., burglary)] in which a death occurs." (§ 189, subd. (e).) Williams makes no argument otherwise, and he in fact concedes in his appellate briefing that he was a participant in a burglary and robbery when someone was killed. Further, this concession accords with that which he made at his 1985 trial as to both the burglary and the first degree felony murder. (See *Williams I*, *supra*, H000697 & H004206, at p. 3.)

Regarding whether the record here conclusively establishes the additional "actual killer" requirement (§ 189, subd. (e)(1)) or the non-actual killer requirement of "intent to

kill" and aiding and abetting of "the actual killer in the commission of murder in the first degree" (§ 189, subd. (e)(2)), neither the jury instructions nor the jury's verdict at the retrial conclusively disclose whether the jurors found the special circumstance to be true because Williams was the actual killer or because he was an aider and abettor.  Therefore, we must examine the record to determine whether all the elements of section 189, subdivision (e)(1) and (e)(2), were embodied in the instructions.

Viewing the special circumstance instructions in whole, we conclude that Williams's jury was adequately apprised of the current "actual killer" requirement in section 189, subdivision (e)(1).  To conclude that Williams was the actual killer under the instructions provided, the jurors had to find that Williams "actually shot Kathleen."  That finding amounts to a determination of a personal killing by Williams, satisfying the current actual-killer requirement.  (See *Vang*, *supra*, 82 Cal.App.5th at p. 91; *People v. Lopez* (2022) 78 Cal.App.5th 1, 16–19.)

As for the non-actual killer requirement of section 189, subdivision (e)(2), the statute requires that "[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree."  (§ 189, subd. (e)(2).)  By contrast, the instructions in this case (namely, instruction Nos. 20 and 25 and the instruction during deliberations) told the jurors that if they did not find Williams to be the actual shooter, they had to find that Williams was an aider and abettor and that he intended to kill or intended to aid another in the killing of Kathleen.  As one Court of Appeal has observed, the language of former CALJIC No. 8.80 (upon which instruction No. 20 was based) "[u]nderstandably . . . does not precisely mirror the wording of the current first degree felony-murder rule."  (*Ervin*, *supra*, 72 Cal.App.5th at p. 108.)

Regarding the intent-to-kill requirement in section 189, subdivision (e)(2), if, under the instructions given, a juror found that Williams intended to kill, that finding plainly satisfied the current intent-to-kill requirement.  If, on the other hand, a juror found

that Williams intended to "aid another in the killing," that mental state equates to harboring an intent to kill. (See *People v. Maury* (2003) 30 Cal.4th 342, 430–432; *People v. Fauber* (1992) 2 Cal.4th 792, 835–836; *People v. Pinholster* (1992) 1 Cal.4th 865, 954–955, disapproved of by *People v. Williams* (2010) 49 Cal.4th 405, 459.) Thus, under either of the two mental states presented by the instructions, the current intent-to-kill requirement would have been established and malice aforethought would not have been imputed to Williams based solely on his participation in the offense. Rather, a juror who concluded that Williams was not the actual killer would have had to find beyond a reasonable doubt that he acted with the currently requisite intent to kill in order to find the special circumstance allegation true.

Similarly, the instructions embodied the requirement in section 189, subdivision (e)(2), that any aiding or abetting had to have been provided to "the actual killer," as compared to some other coperpetrator. (See *Ervin*, *supra*, 72 Cal.App.5th at pp. 108–109.) Here, it is undisputed that there were only two perpetrators. So, assuming Williams were not the shooter of Kathleen, the only other perpetrator Williams could have aided and abetted in committing this crime was his codefendant Payne, who in turn was the "actual killer" of Kathleen. As such, there is no question on this record that if a juror had decided that Williams were not the actual killer, the juror's further conclusion regarding whom Williams aided and abetted necessarily related to Payne as the actual killer.

The final requirement in section 189, subdivision (e)(2), relates to whether any juror who did not find Williams were the actual killer further found necessarily that he "aided, abetted, counseled, commanded, induced, solicited, requested, or assisted [Payne] in the commission of murder in the first degree," (§ 189, subd. (e)(2)) i.e., an unlawful killing by Payne that occurred while he intentionally committed or attempted to commit burglary. This language in section 189, subdivision (e)(2), mirrors that applicable to the special circumstances in section 190.2. (See § 190.2, subd. (c); *Ervin*, *supra*, 72

27

Cal.App.5th at p. 106.)[17]  Regarding the felony-murder special circumstance, our Supreme Court rejected an argument that similar language in former section 190.2, subdivision (b), about intentionally aiding and abetting another "in the commission of murder in the first degree," required the prosecution "to prove, not only that [the defendant] aided or abetted the burglaries and robberies, but also that he 'assisted in the killings themselves.' " (*People v. Dickey* (2005) 35 Cal.4th 884, 900 (*Dickey*).)  Our high court explained that the prosecution did not have to prove the defendant aided and abetted the actual killing because "[a]ll persons aiding or abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design." (*Ibid*.)

Given our Supreme Court's conclusion in *Dickey* about the meaning of aiding and abetting another "in the commission of" first degree felony murder, the central issue for us to decide under section 189, subdivision (e)(2) (*Dickey*, *supra*, (2005) 35 Cal.4th at p. 900), is whether the jury instructions and findings conclusively establish that a juror who did not find Williams to be the actual killer was required to find that Williams aided and abetted Payne in the commission of a burglary during which Payne caused Kathleen's death.

At Williams's initial trial, the jury was instructed that to find Williams guilty of first degree felony murder it had to find that he had the specific intent to commit burglary.  At Williams's retrial, the trial court instructed the jury that Williams had previously been found guilty of both first degree murder and burglary.  The trial court also instructed the jurors that they had to find whether Williams was an aider and abettor

---

[17] Section 190.2, subdivision (c), provides:  "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under [s]ection 190.4."  (§ 190.2, subd. (c).)

(instruction Nos. 20 & 25). To guide the jurors in that determination, the court provided the requirements for finding a person an aider and abettor, including that the aider and abettor had to have knowledge of the perpetrator's unlawful purpose and aid, promote, encourage or instigate "the commission of the crime" with the intent or purpose to commit, encourage, or facilitate "the commission of the crime" (instruction No. 27). Under the present circumstances, a juror necessarily would have understood "the crime" referenced in the aiding and abetting instruction to be Williams's and Payne's commission of burglary, during which Payne killed Kathleen in furtherance of the planned burglary. That was the only factual circumstance for the purposes of aiding and abetting put to the jury by the instructions.

Furthermore, we generally agree with the Attorney General that the instruction which called on the jury to determine whether the murder of Kathleen " 'was a natural and probable consequence of such originally contemplated crime,' " i.e., the target offense of burglary (instruction No. 28), does not negate the jury's aider-and-abettor finding for purposes of satisfying section 189, subdivision (e)(2). Given the other instructions on the requirements for finding that Williams was an aider and abettor of Payne, that the jury was also told Williams was liable for the natural and probable consequences of aiding and abetting a burglary would not have led a juror to understand that instruction as a direction to eschew deciding whether Williams aided and abetted the commission of the underlying burglary (i.e., the target offense necessary for felony-murder aider-and-abettor liability) or disregard the intent-to-kill requirement for Williams as the aider and abettor.

Because "the crime" described in the aiding and abetting instruction encompassed Payne's commission of first degree felony murder, and the jury's verdict stated that Kathleen was intentionally killed while Williams was engaged in the commission or attempted commission of burglary, we conclude that the aiding and abetting requirement of section 189, subdivision (e)(2), was conclusively established.

29

In sum, given Williams's convictions at his 1985 trial, by finding the special circumstance allegation true, the jury at Williams's 1990 retrial necessarily found that he was either the actual killer or harbored the intent to kill and aided and abetted the actual killer in the commission of first degree murder.  Because Williams was convicted on a valid theory of murder under amended sections 188 and 189, he is ineligible for relief under section 1170.95.

### III.  DISPOSITION

The trial court's June 3, 2021 order is affirmed.

_____
                Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Lie, J.

**H049231**
*People v. Williams*